Daniel T. Pascucci (SBN 166780)
dtpascucci@mintz.com
Eric J. Eastham (SBN 261048)
ejeastham@mintz.com
Justin S. Nahama (SBN 281087)
jsnahama@mintz.com
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
3580 Carmel Mountain Road, Suite 300
San Diego, CA 92130
Telephone:  (858) 314-1500
Facsimile:   (858) 314-1501

Matthew C. Hurley (*admitted pro hac vice*)
mhurley@mintz.com
Brian P. Dunphy (*admitted pro hac vice*)
bdunphy@mintz.com
Sean Grammel (*admitted pro hac vice*)
smgrammel@mintz.com
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000
Facsimile:  (617) 542-2241

Attorneys for Defendants

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AZCO BIOTECH INC., a Nevada Corporation; and J. ADAMS, an individual,<br><br>     Plaintiffs,<br><br>  vs.<br><br>STEVEN GORDON, an individual; JINGYUE JU, an individual; JERZY OLEJNIK, an individual; and INTELLIGENT BIO-SYSTEMS, INC., a Delaware Corporation; and DOES 1-50, inclusive,<br><br>     Defendants.<br><br>AND RELATED COUNTER-CLAIMS. | Case No. 3:12-cv-02599-BEN-DHB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF IBS'S MOTION *IN LIMINE* TO EXCLUDE PLAINTIFFS' DAMAGES EXPERT, BRIAN BUSS**<br><br>The Honorable Roger Benitez<br><br>Pretrial Conference: September 14, 2015<br>Conference Time: 10:30 am<br>Courtroom: 5A<br><br>Complaint Filed:  10/24/2012<br><br>**ORAL ARGUMENT REQUESTED SUBJECT TO COURT APPROVAL** |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ....................................................................................................... 3

I.    The Next-Generation Sequencing Market is a competitive market
      involving complex science. ........................................................................ 3

II.   Mr. Buss is a CFA with expertise in intellectual property and valuation,
      but no experience in the next-generation sequencing market. ................... 3

III.  Mr. Buss made several assumptions in his expert opinion. ....................... 5

ARGUMENT .......................................................................................................... 7

I.    Expert testimony on damages, from any expert, is unnecessary and
      would not help the determination of the issues remaining in this case. .......... 7

      A.    The nature of the parties' relationship shows that Azco is not
            entitled to lost profits and thus expert testimony on lost profits is
            unnecessary. ...................................................................................... 8

      B.    Because IBS and Azco were small companies with no track record
            of sales, any testimony about Azco's lost profits would be too
            speculative. ..................................................................................... 10

II.   Mr. Buss's opinion in particular should be excluded. .............................. 12

      A.    Mr. Buss lacks the proper qualifications to make the assumptions
            that underlie his opinion. ................................................................ 12

      B.    Mr. Buss's methodology in estimating Plaintiffs' damages is
            unreliable and results in speculative lost profits damages. ............ 14

            1.    Flaw 1: Mr. Buss accepted Mr. Adams's assumptions
                  without performing an independent analysis. ....................... 15

            2.    Flaw 2: Mr. Buss unreasonably relies on Plaintiffs'
                  forecasts to project sales of the MAX-Seq. ........................ 16

            3.    Flaw 3: Mr. Buss relies on IBS's sales forecasts for the
                  MINI-20 from one of IBS's grant applications, but ignores
                  all of the caveats and assumptions utilized in that forecast. ...... 18

            4.    Flaw 4: Mr. Buss assumes that Azco would be selling future
                  generations of IBS products into perpetuity. ...................... 19

            5.    Flaw 5: Mr. Buss assumed that Azco would be IBS's
                  exclusive distributor, despite the undisputed fact that Azco
                  was a non-exclusive distributor. ......................................... 21

6.      Flaw 6: Mr. Buss projected Azco's growth by comparing unprofitable Azco to well-established companies with billions in revenue...................................................................21

CONCLUSION.....................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amelco Electric v. City of Thousand Oaks*,
  27 Cal. 4th 228 (2002) ......................................................................... 10

*Ask Chemicals, LP v. Computer Packages, Inc.*,
  593 Fed. App'x 506 (6th Cir. 2014) ..................................................... 17

*Beech Aircraft Corp. v. United States*,
  51 F.3d 834 (9th Cir. 1995) .................................................................... 8

*CIT Business Group v. Graco Fishing and Rental Tools, Inc.*,
  815 F. Supp. 2d 673 (S.D.N.Y. 2011) ................................................... 17

*Daubert v. Merrell Dow Pharmaceuticals*,
  509 U.S. 579 (1993) .......................................................................... 7, 21

*Estate of Barabin v. AstenJohnson, Inc.*,
  740 F.3d 457 (9th Cir. 2014) ................................................................... 7

*General Electric v. Joiner*,
  522 U.S. 136 (1997) ............................................................................. 10

*Grupe v. Glick*,
  26 Cal. 2d 680 (1945) .......................................................................... 10

*Hilderman v. Enea TekSci, Inc.*,
  No. 05-cv-1049, 2010 U.S. Dist. LEXIS 11391 (S.D. Cal. Feb. 10,
  2010) ............................................................................................... 10, 17

*Kids' Universe v. In2Labs*,
  95 Cal. App. 4th 873 (2002) ....................................................... 10, 14, 21

*King-Indiana Forge, Inc. v. Millennium Forge, Inc.*,
  No. 07-cv-00341, 2009 U.S. Dist. LEXIS 96131 (S.D. Ind. Sept. 29,
  2009) ............................................................................................... 15, 17

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ............................................................................ 7, 12

iii

*Lewis Jorge Constr. Mgmt. v. Pomona Unified School District*,
  34 Cal. 4th 960 (2004) ........................................................................... 9

*McGlinchy v. Shell Chemical Co.*,
  845 F.2d 802 (9th Cir. 1988) ............................................................... 17

*Munchkin, Inc. v. Luv N' Care, Ltd.*,
  No. 13-cv-07228, 2015 U.S. Dist. LEXIS 23593 (C.D. Cal. Feb. 26,
  2015) ....................................................................................................... 12

*Nelson v. Matrixx Initiatives*,
  No. 09-02904, 2012 U.S. Dist. LEXIS 118300 (N.D. Cal. Aug. 21,
  2012) ................................................................................................ 14, 18

*Oculu, LLC v. Oculus VR, Inc.*,
  No. 14-0196, 2015 U.S. Dist. LEXIS 74666 (C.D. Cal. June 8, 2015) ............ 7, 10

*Parlour Enterprises v. Kirin Group, Inc.*,
  152 Cal. App. 4th 281 (2007) ........................................................ *passim*

*Resort Video, Ltd. v. Laser Video, Inc.*,
  35 Cal. App. 4th 1679 (1995) ............................................................. 10

*Sargon Enterprises, Inc. v. University of Southern California*,
  55 Cal. 4th 747 (2012) ................................................................... 10, 22

*United States v. Santini*,
  656 F.3d 1075 (9th Cir. 2011) ............................................................. 12

*Wallach v. Longevity Network, Ltd.*,
  No. 04-2404, 2006 U.S. Dist. LEXIS 97120 (C.D. Cal. Apr. 26,
  2006) ...................................................................................................... 12


**Statutes**

Cal. Civ. Code § 3300 ............................................................................ 5, 8

Cal. Civ. Code § 3301 .......................................................................... 5, 10

iv

**Other Authorities**

FED. R. EVID. 401 ................................................................................................9, 12, 20

FED. R. EVID. 403 .....................................................................................................*passim*

FED. R. EVID. 702 .....................................................................................................*passim*

FED. R. EVID. 703 ..........................................................................................10, 14, 15

## INTRODUCTION

Plaintiffs seek to try a case that no longer exists – if it ever did at all.  Even though the Court has now dismissed 17 of the 18 claims that Plaintiffs originally filed, the Plaintiffs continue to believe that their sole remaining claim in this case – in which they allege that IBS breached an oral, *non-exclusive* distributor agreement – entitles them to over $15 million in damages.  That is the same amount that Plaintiffs claimed at the beginning of discovery, before dismissal of their claims for breach of an alleged joint venture/partnership agreement, breach of fiduciary duty, and promissory estoppel (among others).

The best example of Plaintiffs' head-in-the-sand approach to this case is their proffered testimony of damages expert Brian Buss, who, unless excluded by the Court, intends to testify that Azco has incurred "lost profit" damages exceeding $15 million.  There are two primary reasons why the Court should exclude Mr. Buss: (1) the nature of the parties' limited, non-exclusive distribution relationship shows that Azco is not entitled to lost profits and thus expert testimony on lost profits – from Mr. Buss or anyone else – is irrelevant and inadmissible; and (2) Mr. Buss himself should be excluded because he is not qualified to make the assumptions that lie at the heart of his report and his unreliable methodology resulted in incredibly speculative lost profit calculations.

As a threshold matter, this is not a lost profits case.  Because the alleged oral agreement was non-exclusive, IBS was under no obligation to sell a certain percentage of its products through Azco, and therefore it is pure speculation to predict how many units IBS would have sold through Azco, other distributors, or by itself.  The alleged oral agreement, moreover, did not obligate IBS to continue selling the products covered by the agreement, and thus any expert testimony on lost profits would necessarily ignore the fact that IBS was always free to discontinue a product line altogether. Finally, future lost profits are not recoverable given that either party could terminate their non-exclusive distribution relationship upon reasonable notice,

1

1    with or without cause.  For all of these reasons, expert testimony on lost profits, from

2    Mr. Buss or anyone else, should be prohibited.

3         For several additional reasons, Mr. Buss himself should not be permitted to

4    testify at the trial of this matter.  By his own admission, Mr. Buss is not an expert on

5    the highly complex and specialized next-generation DNA sequencing ("NGS")

6    market.  Nevertheless, Mr. Buss made a series of baseless assumptions about the

7    NGS market to calculate projected lost profits, including projections for Azco's sales

8    over the next ten years and beyond.  Mr. Buss is simply not qualified to make the

9    assumptions that serve as the foundation for his testimony on lost profits.

10        To make matters worse, Mr. Buss's methodology was highly flawed and he

11   made factual assumptions that are demonstrably wrong.  Mr. Buss's entire damages

12   model is premised on the assumption that Azco would sell IBS's NGS instruments

13   into perpetuity – in fact, more than 90% of the lost profits in his model comes after

14   six years – even though there is absolutely no basis for this absurd assumption.  His

15   model also assumes that Azco would be IBS's *exclusive* distributor for all of IBS's

16   products, despite the undisputed fact that IBS and Azco had a *non-exclusive*

17   relationship.  Mr. Buss also assumed that Azco would be IBS's exclusive distributor

18   for products not even mentioned in the Term Sheet and even for *future* products that

19   haven't been invented yet. Moreover, in making assumptions about market share,

20   growth rates, and other market-specific factors, Mr. Buss assumed that Azco was

21   comparable to publicly traded, billion-dollar companies, even though Azco was a

22   failing start up whose revenues had never exceeded $2 million and it operated at a

23   loss for each year between 2009 and 2012.  Finally, Mr. Buss's proffered testimony

24   ignores the crucial fact that IBS and Azco were both start-ups with no track record of

25   sales and Azco had sold a grand total of *one* NGS instrument over the course of the

26   parties' 16-month relationship.  And yet, Mr. Buss assumed that Azco would sell

27   hundreds of IBS's instruments over many years.

28        The Court should prohibit Mr. Buss from testifying because his purely

2

speculative testimony would be irrelevant and unreliable. Rather than assisting the jury understand the issues in the case, Mr. Buss's testimony would confuse the issues, mislead the jury, waste time, and unfairly prejudice IBS.

BACKGROUND

## I.   The Next-Generation Sequencing Market is a competitive market involving complex science.

This case involves companies and products that are part of the NGS market. DNA sequencing is the process of reading the nucleotide bases in a DNA molecule, and is used in many disciplines such as diagnostics, biotechnology, forensic biology, and biological systematics. *See* Complaint, Dkt. No. 1, ¶ 21. DNA sequencing has assisted biological research and discovery. *Id.* The rapid speed of modern DNA sequencing has helped scientists sequence the entire genomes of animals, plants, microbes, and even humans, as part of the Human Genome Project. *Id.*

IBS licenses DNA sequencing technology known as Sequencing by Synthesis ("SBS") from Columbia University, which holds the patent to that intellectual property. *Id.* at ¶ 25. This SBS chemistry was part of the MAX-Seq and MINI-20. The NGS market is competitive, with several large companies already selling DNA sequencers and making revenues in excess of $1 billion.[1]

## II.   Mr. Buss is a CFA with expertise in intellectual property and valuation, but no experience in the next-generation sequencing market.

Brian Buss is a Chartered Financial Analyst and a founder of Nevium Intellectual Property Solutions.[2] He "provides licensing strategies for intellectual asset portfolios, guidance in determining economic damages in civil litigation, and performs valuations of trademarks, patents, brand assets, copyrights, and other

---

[1] *See* Exhibit A to the Declaration of Sean Grammel ("Grammel Decl."), Expert Report of Brian Buss (August 27, 2014) ("Buss Report"), at 4.
[2] *Id.* at 24.

3

1    intangible assets."[3/]   He has over 20 years of experience "analyzing and valuing

2    business enterprises, intellectual properties, and intangible assets."[4/]

3          Mr. Buss does not hold himself out to be an expert on the molecular diagnostic

4    or next-generation DNA sequencing ("NGS") markets.[5/]   He admits that he has no

5    expertise in projecting sales of NGS sequencers.[6/]   Over the course of his career, Mr.

6    Buss has not studied DNA sequencers as part of his education; he has never worked

7    for a company that sold, marketed, or manufactured DNA sequencers; and he has

8    never predicted the future sales of DNA sequencers.[7/] He has never testified as an

9    expert about his valuation or financial analysis of companies engaged in DNA

10   sequencing.[8/]   And he does not profess to be an expert on the typical process for the

11   development and launch of a DNA sequencer.[9/]

12         Mr. Buss's paid engagement for Azco was the first time he had been retained

13   to quantify losses or damages suffered by a company in the molecular diagnostics and

14   NGS market, as well as the first time that he valued a revenue stream (or lost profits)

15   for a company in those markets.[10/]   This was also the first time that Mr. Buss had been

16   engaged as an expert witness for a distributor or manufacturer in the life sciences

17   industry, as well as the first valuation he had performed as an expert witness for a

18   start-up company in the life sciences industry.[11/]   He has also never provided an

19   opinion on damages arising from a breach of contract.[12/]

20

21

22   _____

23   [3/] *Id.*
     [4/] *Id.* at 1

24   [5/] Grammel Decl., Exhibit B, Deposition Transcript of Brian Buss ("Buss Depo."), at
     133:14—135:7.

25   [6/] *Id.* at 165:3-5.
     [7/] *Id.* at 13:14—14:3.

26   [8/] *Id.* at 14:4-14.
     [9/] *Id.* at 124:7-15.

27   [10/] *Id.* at 130:12—131:13.
     [11/] *Id.* at 16:9—17:4.

28   [12/] *Id.* at 106:5-13.

### III.    Mr. Buss made several assumptions in his expert opinion.

Unless excluded, Mr. Buss intends to testify that Azco is entitled to more than $15 million in lost profits.[13/]  Mr. Buss has transformed one sale of a MAX-Seq—for which Azco, a non-exclusive distributor, turned a $68,000 profit—into more than $15 million dollars in damages. To calculate Azco's alleged damages, Mr. Buss attempted to predict how many instruments Plaintiffs would have sold, and the profit Plaintiffs would have made, if Azco had continued to resell IBS instruments.  To arrive at this figure, Mr. Buss's damages model is based on several foundational assumptions:

(1) That the parties would work together into perpetuity.[14/]  Even though Mr. Buss does not know whether a perpetual contract is typically assumed in damages models in the NGS industry, he used a "Present Value of Perpetuity" estimate (amounting to $5.65 million) to project lost profits into perpetuity.[15/]

(2) That Azco would be IBS's *exclusive* distributor for all of IBS's products, despite the undisputed fact that IBS and Azco had a ***non-exclusive*** relationship.[16/]

(3) That Azco would be IBS's *exclusive* distributor for products not included in the Term Sheet and even for future products that IBS has not yet invented.[17/]

(4) That the parties' *five-year* sales forecasts generated in 2011, which proved incorrect, could be used as the basis to calculate lost profits into perpetuity.  First, even though Azco sold only one instrument by the time IBS terminated its relationship with Azco in July 2012, Mr. Buss used outdated, incorrect sales forecasts

---

[13/] IBS assumes, based on Plaintiffs' Pretrial Memo, that they have abandoned their argument that Azco was entitled to a portion of the purchase price that QIAGEN paid for IBS.  Plaintiffs' Memorandum of Contentions of Fact and Law ("Plaintiffs' Pretrial Memo"), Dkt. No. 116, at 13-14.  In their Pretrial Memo, Plaintiffs failed to provide a narrative statement of Mr. Buss's proposed testimony, as required by Local Rule 16.1.f.2.d, and so IBS furthers objects to Mr. Buss's testimony on those grounds.  Even if this theory were not abandoned, a breach of contract claim cannot support that damages theory. *See* Cal. Civ. Code §§ 3300, 3301.

[14/] Grammel Decl., Exhibit B, at 189:5—190:5.

[15/] *Id.*; Grammel Decl., Exhibit A, at Schedule 9.

[16/] Grammel Decl., Exhibit B, at 87:10—89:22; Plaintiffs' Pretrial Memo, at 4.

[17/] Grammel Decl., Exhibit B, at 33:4—40:5; 173:8—174:20.

1  from December 2011.[18]   By July 2012 (two years before Mr. Buss's report),

2  however, it was already clear that Azco and IBS had not met sales forecasts for IBS's

3  instruments and Azco had sold only one instrument in 16 months.  Rather than basing

4  his damages model on the actual data, Mr. Buss relies on unrealized, outdated

5  projections as evidence of the volume of IBS products Azco would have sold.

6  Next, he projected sales beyond five years into perpetuity using a revenue

7  growth rate that he derived from articles he found online.[19]   According to his

8  damages model, the value of Azco's lost profits from year **six** into **perpetuity** is more

9  than $14 million.[20]   In other words, Mr. Buss speculates that more than 90% of

10 Azco's lost profit damages would have been incurred *after* the outermost, five-year

11 projection of sales that J Adams or IBS ever made.  Not even the parties ventured a

12 guess at sales forecasts beyond five years for business planning purposes. Yet Mr.

13 Buss proffers expert testimony contending that he can he accurately predict, estimate

14 with precision the costs to Azco associated with those sales, and calculate Azco's lost

15 profits into perpetuity.

16 (5) That the assumptions Plaintiff J Adams directed Mr. Buss to make were

17 accurate, without independent verification.

18 (6) That Azco was comparable to publicly traded, billion-dollar companies,

19 including market leaders in the NGS industry.[21] All of the companies to which Mr.

20 Buss compared Azco have annual revenues over $1 **billion**.[22]   Azco's revenue had

21 not exceeded $2 **million**, and it failed to make a profit in 2009, 2010, 2011, or

22 2012.[23]

---

[18] Grammel Decl., Exhibit B, at 141:2—142:17.
[19] *Id.*, at 171:13—175:21.
[20] *See* Grammel Decl., Exhibit A, at Schedule 9.
[21] Grammel Decl., Exhibit B, at 133:14-135:7.
[22] *Id.*; Grammel Decl., Exhibit A, at Schedule 11.
[23]  Grammel Decl., Exhibit B, at 118:12—119:7; Grammel Decl., Exhibit C, Deposition of Marianne Varner, at 63:8-20.

## ARGUMENT

Under Federal Rule of Evidence 702, expert testimony must satisfy four requirements to be admissible: (1) the expert's specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue; (2) the testimony is based on sufficient facts or data, (3) the testimony is the product of reliable principles and methods, and (4) the expert has reliably applied the principles and methods to the facts of the case.  FED. R. EVID. 702; *see Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993); *see also Oculu, LLC v. Oculus VR, Inc.*, No. 14-0196, 2015 U.S. Dist. LEXIS 74666 (C.D. Cal. June 8, 2015).  Expert testimony must be "both relevant and reliable" to satisfy the court's "gatekeeping" duty.  *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014); *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).  The proponent of the expert testimony bears the burden of showing that the admissibility requirements are satisfied.  FED. R. EVID. 702, advisory committee's notes.

Here, the proposed testimony of Brian Buss does not satisfy the requirements of Rule 702.  His testimony should be excluded for two general reasons: (1) no expert testimony on damages is necessary in this case because the question of whether any damages exist as the result of IBS's termination of Azco as a non-exclusive distributor on 45 days' notice is purely a factual one that a factfinder can determine, and (2) Mr. Buss's opinion suffers from several fatal flaws, including calculating projected damages without a basis in fact and by making inaccurate assumptions, resulting in a lost profits analysis that is completely speculative and therefore of no probative value.  Mr. Buss's testimony would also unfairly prejudice IBS, confuse the issues, mislead the jury, and cause undue delay.  FED. R. EVID. 403.

## I.   Expert testimony on damages, from any expert, is unnecessary and would not help the determination of the issues remaining in this case.

When expert testimony is offered to explain an issue or fact that average jurors can understand on their own, that expert opinion may be deemed non-helpful and

inadmissible.  *Beech Aircraft Corp. v. United States*, 51 F.3d 834, 852 (9th Cir. 1995); FED. R. EVID. 403.   Here, for several reasons, expert testimony is not necessary or helpful to the jury and is therefore inadmissible.

### A. The nature of the parties' relationship shows that Azco is not entitled to lost profits and thus expert testimony on lost profits is unnecessary.

It is black-letter law that the measure of contract damages is the amount that will compensate the plaintiff for all the damages proximately caused by the breach. Cal. Civ. Code § 3300.  Several aspects of the parties' relationship show why expert testimony on lost profits is not probative of any damages to which Azco would be entitled, even if it proves breach of an oral agreement.

First, IBS and Azco had a non-exclusive distributor relationship, as Azco admits.[24]   Because the alleged oral agreement was non-exclusive, IBS could sell some or even all of its products through other distributors, or on its own.[25] IBS was under no obligation to sell a certain percentage of its products through Azco, and therefore it can only be speculation to predict how many units IBS would have sold through Azco, other distributors, or by itself.  Indeed, a search of California case law revealed no cases in which a court has allowed an expert damages witness to opine on lost damages for breach of a *non-exclusive* distribution agreement.

Second, IBS had no obligation to continue selling any specific products.  There is nothing in the Term Sheet or the parties' communications that obligated IBS to continue to market and sell the MAX-Seq or the MINI-20. Any expert testimony on lost profits would necessarily ignore the fact that IBS was always free to discontinue a product line altogether. Just because a manufacturer worked with a distributor on a non-exclusive basis does not mean that the manufacturer is required to continue

---

[24] *See* Plaintiffs' Pretrial Memo, at 4.
[25]  Mr. Buss admits the non-exclusive nature of the relationship, but his expert analysis nonetheless assumes that all of IBS's sales would go through Azco into perpetuity.  *See infra* section II.A.4.

8

selling a particular product, even if the product is obsolete, fails to generate profits, does not fit into the manufacturer's strategic plan, or is not well-received within the competitive NGS market, which is already occupied by established products. Any expert damages testimony about future lost profits necessarily ignores the non-exclusive nature of the alleged agreement and IBS's discretion to terminate the product line altogether.

Third, lost profits are not recoverable given the parties' termination rights. Damages seek to put the plaintiff in as good a position as it would have occupied without the alleged breach. *Lewis Jorge Constr. Mgmt. v. Pomona Unified School District*, 34 Cal. 4th 960, 967 (2004) (citation omitted). Although Azco contends that any oral agreement had a perpetual (or five-year) duration, for the reasons discussed in IBS's other motions *in limine*, the Court should not allow Azco to introduce evidence that any oral agreement had a five-year or perpetual term because (1) unexpressed subjective intentions of a contract are not admissible, and (2) an oral agreement that could not be performed within one year violates the Statute of Frauds. *See* IBS's Motion *in Limine* to Exclude Evidence That Would Violate the Statute of Frauds; IBS's Motion *In Limine* to Exclude Evidence of Plaintiffs' Unexpressed Intent (both filed simultaneously with this Motion).

Azco's alleged damages should therefore be limited to the period before the effective termination date. The question of whether Azco has any damages before the effective termination date, such as payments due to Azco that were not made, only requires fact witness testimony from a percipient witness (like J Adams), not expert testimony. In other words, no expert testimony is necessary to explain these issues because a jury can understand them on its own.

Because of the nature of a non-exclusive distribution agreement, any expert witness testimony projecting damages for alleged sales that *might* have occurred into perpetuity after IBS terminated its relationship with Azco is irrelevant and therefore inadmissible. *See* FED. R. EVID. 401. To the contrary, such testimony only would

9

1  confuse the issues, mislead the jury, and would unduly delay the determination of the

2  real issues in this case.  *See* FED. R. EVID. 403.

3  **B. Because IBS and Azco were small companies with no track record of**

4  **sales, any testimony about Azco's lost profits would be too speculative.**

5  Any projections of lost profits for two small companies, based on the *single*

6  sale of a newly developed DNA sequencing technology, in a market dominated by

7  other companies, is simply too speculative.  FED. R. EVID. 702; FED. R. EVID. 703.

8  Expert opinion testimony that is without factual basis and is instead based on

9  "speculation or conjecture" is inadmissible at trial.  *Oculu*, 2015 U.S. Dist. LEXIS

10  74666, at *55 (citation omitted); *see also General Electric v. Joiner*, 522 U.S. 136,

11  146 (1997); *Hilderman v. Enea TekSci, Inc.*, No. 05-cv-1049, 2010 U.S. Dist. LEXIS

12  11391 (S.D. Cal. Feb. 10, 2010) (excluding expert opinion on lost profits as too

13  speculative). Expert opinions that are connected to existing data only through the *ipse*

14  *dixit* of the expert should not be admitted.  *See General Electric*, 522 U.S. at 146.

15  Lost profits may be recoverable as damages for breach of contract only where

16  "the evidence makes reasonably certain their occurrence and event."  *Sargon*

17  *Enterprises, Inc. v. University of Southern California*, 55 Cal. 4th 747, 773-74 (2012)

18  (citation omitted); Cal. Civ. Code § 3301.[26/]  A plaintiff may not recover lost profits

19  on the basis of "speculative" or unfounded "assumptions," "unreasonable

20  comparisons" or "unexplained projections."  *Kids' Universe*, 95 Cal. App. 4th at 885-

21  88.  Profits dependent on future events are allowed only "where their nature and

22  occurrence can be shown by evidence of ***reasonable reliability***."  *Grupe v. Glick*, 26

23  Cal. 2d 680, 693 (1945) (emphasis added); *Resort Video, Ltd. v. Laser Video, Inc.*, 35

24  Cal. App. 4th 1679, 1697-98 (1995).

25  ───────────────

26  [26/]  The requirement for certainty in damages helps protect contracting parties:
   predictability in potential damages helps to "encourage contractual relations and

27  commercial activity by enabling parties to estimate in advance the financial risks of
   their enterprise" and so it "plays an important role in our commercial system."

28  *Amelco Electric v. City of Thousand Oaks*, 27 Cal. 4th 228 (2002) (citations omitted).

1    Under California law, a plaintiff may establish lost profit damages for an

2 unestablished business through expert testimony only where the expert's opinion is

3 supported by tangible evidence with a substantial and sufficient factual basis, not just

4 speculation or hypotheticals. *Parlour Enterprises v. Kirin Group, Inc.*, 152 Cal. App.

5 4th 281, 287 (2007). The plaintiff's financial history or record of sales in the industry

6 is probative of the potential for lost profits, as is a third party's experience in the

7 same enterprise subsequent to the alleged breach. *Id.* at 288.

8    Here, no lost profits can be shown with any "reasonable reliability." IBS and

9 Azco were both small companies with no track record of profitably selling DNA

10 sequencing instruments. To the contrary, IBS was just starting to bring its technology

11 to market, while Azco was a self-described "used instrument" company that was

12 struggling to keep its doors open. Azco sold one IBS product over the parties' 16-

13 month relationship. To the extent that Azco had any limited experience selling DNA

14 sequencers, it had failed.[27] Before working with IBS, Azco did try to sell one other

15 DNA sequencer, called the Polonator, but was not successful or profitable—in fact,

16 the machine caught on fire and was the subject of another lawsuit.[28]

17    The parties also had no track record of selling IBS's newly developed

18 instruments. Azco sold one MAX-Seq, and there was a problem with that

19 instrument.[29] IBS discontinued the MAX-Seq line altogether in July 2012. IBS only

20 began to make "early access" beta versions of the MINI-20 available in early 2012,

21 including an IBS sale to the University of New Mexico.[30] IBS terminated its

22 relationship with Azco not long after, in July 2012, and since then has not sold a

23 single MAX-Seq or MINI-20. This narrow window of time cannot reliably serve as

24

---

25  [27] *See* Grammel Decl., Exhibit D, Cross-Complaint, *Azco Biotech Inc. v Kollmorgen*

26  *Corp.*; Grammel Decl., Exhibit E.
   [28] Azco admitted in early March 2011 (before the exchange of any draft of the Term

27 Sheet) that the Polonator did not work. Grammel Decl., Exhibit F.
   [29] Grammel Decl., Exhibit B, at 114:4-17.

28  [30] *See* Order on Summary Judgment, at 5; Grammel Decl., Exhibit G.

---

11

the basis of a lost profits projection into perpetuity for two companies with no track record of sales.  This is not a situation where an established manufacturer with a long track record of product sales terminated a distributor and then contracted with another distributor, which continues the track record of success.  Under these circumstances, it is pure speculation for any expert, even one with expertise in the NGS industry (which Mr. Buss lacks), to predict how many instruments would be sold in the future. *See Parlour*, 152 Cal. App. 4th at 288.

For all of these reasons, any expert testimony on damages, from Mr. Buss or anyone else, would be irrelevant and inadmissible.  FED. R. EVID. 401. It would also unfairly prejudice to IBS and mislead the jury. FED. R. EVID. 403. In fact, expert testimony about lost profits would only serve to confuse the real damages issue in the case: did Azco sell IBS products for which Azco was not compensated?

**II.    Mr. Buss's opinion in particular should be excluded.**

**A. Mr. Buss lacks the proper qualifications to make the assumptions that underlie his opinion.**

Mr. Buss is not qualified to make the assumptions that underlie his expert report.  An expert must have "a reliable basis in the knowledge and experience of his discipline."  *Kumho Tire*, 526 U.S. at 148; *see Munchkin, Inc. v. Luv N' Care, Ltd.*, No. 13-cv-07228, 2015 U.S. Dist. LEXIS 23593, *2-4 (C.D. Cal. Feb. 26, 2015) (excluding an opinion where the proposed expert lacked the "requisite technical background or expertise to have specialized knowledge" required for his testimony). An expert in one field cannot express an opinion relying on information that requires expertise in another field.  *United States v. Santini*, 656 F.3d 1075, 1078 (9th Cir. 2011); *see also Wallach v. Longevity Network, Ltd.*, No. 04-2404, 2006 U.S. Dist. LEXIS 97120, *6-12 (C.D. Cal. Apr. 26, 2006) (excluding damages expert who lacked experience and expertise in the relevant industry).

In this instance, Mr. Buss admits that he has no experience or expertise in the complex and specialized NGS industry.[31/] *See* FED. R. EVID. 702. Nevertheless, Mr. Buss has made a series of important, but baseless, assumptions about the NGS market to calculate projected lost profits, which render Azco's claimed lost profits speculative, including: (1) forecasts about the industry's earnings, margins, and revenue growth; (2) comparisons of Azco to other NGS companies, including which company's performance would be most similar to Azco; (3) projections for Azco's sales (and the costs to Azco associated with those sales) over the next ten years and beyond based on market growth.[32/] This is not a situation where Plaintiffs designated one expert with expertise in the NGS market to opine about market size, market share, the competitive landscape, and the like, and then a second expert (an economist or a financial analyst) who accepts those assumptions and incorporates them into a damages model.   Instead, Azco directed Mr. Buss to do both: make expert assumptions about the NGS market *and* build an economic model for damages.  Mr. Buss may have experience and expertise in the latter, but he admits he has no experience—much less expertise—in the former.

Lacking any industry expertise, Mr. Buss based the assumptions in his damages model on cherry-picked data without establishing that he has the expertise to discern relevant data from irrelevant or outdated information.  For instance, he bases many of his assumptions about the NGS market on articles that he found online.[33/] The information in these articles informed his assumption about the growth rate of the NGS industry, a crucial foundation for his (1) calculation of projected revenue from years 6-10, which totals $**8.48 million**, and (2) projection of $**5.65 million** dollars in lost profits using a "Present Value of Perpetuity" to calculate revenue

---

[31/] Grammel Decl., Exhibit B, at 130:12—135:7; 165:3-5 ("Q: And you don't have any independent expertise in projecting sales of next generation sequencers; correct? A: No.").
[32/] *Id.*, at 134:17-23; 135:14—137:24; 164:8—165:5; 171:13—175:21.
[33/] *Id.*, at 131:4—133:13.

1  beyond year 10.[34/] In other words, more than $14 million of the alleged $15 million in

2  lost profits comes *after year five*, even though Plaintiff J Adams testified that he

3  projected sales for only five years and that the life cycle for the MAX-Seq and the

4  MINI-20 would be five years.[35/]

5       When asked why he relied on a particular article about the NGS market, Mr.

6  Buss said that he thought the article "seemed to cover the industry that involved other

7  people that were selling related or similar equipment."[36/] When specifically asked if

8  the articles he selected were a more reliable source of information than other

9  publications, he said no.[37/] Making key industry-related assumptions without industry

10  expertise is not reliable.  *See* Fed. R. Evid. 702; Fed. R. Evid. 703.

11       Mr. Buss is not qualified to make the assumptions about the NGS market that

12  lie at the heart of his opinion and therefore his testimony should be excluded.

13      **B. Mr. Buss's methodology in estimating Plaintiffs' damages is unreliable**

14        **and results in speculative lost profits damages.**

15       Even if Mr. Buss were an expert on the NGS market, his opinion is flawed for

16  several other reasons as well that render his lost profits analysis speculative.

17  "Unexplained selective use of the facts" fails to satisfy Federal Rule of Evidence 702.

18  *See Nelson v. Matrixx Initiatives*, No. 09-02904, 2012 U.S. Dist. LEXIS 118300, *28

19  (N.D. Cal. Aug. 21, 2012); *see also Kids' Universe v. In2Labs*, 95 Cal. App. 4th 873,

20  885-88 (2002) (stating that lost profits are not recoverable where they are

21  "speculative" or based on "unfounded "assumptions").  As Mr. Buss testified, the

22  documents and information he chose to incorporate into his opinion had no scientific

23  or expert foundation. Specifically, Mr. Buss's methodology suffers from six flaws: (i)

24  

25  [34/] *Id.*, at 133:14—137:24 ("Q: What makes—what was the basis for that statement in
   your expert report?  A: Well, information I found in one of the articles or research

26  reports that I read, combined with looking at the descriptions of the companies."); *see
   also* Grammel Decl., Exhibit A, at Schedule 9.

27  [35/] Grammel Decl., Exhibit H, Deposition Transcript of J Adams, at 101:5—103:7.
   [36/] Grammel Decl., Exhibit B, at 131:10—132:10.

28  [37/] *Id.*, at 132:11—133:13.

1    he relied on information from J Adams without verifying or independently evaluating

2    it, (ii) he used Plaintiffs' outdated and inaccurate sales projections for the MAX-Seq,

3    (iii) he cherry-picked data from one of IBS's grant applications to forecast sales of

4    the MINI-20, without addressing the caveats and assumptions that accompanied such

5    data, (iv) he assumed Azco would sell IBS's products into perpetuity with no factual

6    support for that assumption, (v) he assumed Azco would be IBS's exclusive

7    distributor, despite the undisputed fact that Azco and IBS had a non-exclusive

8    relationship, and (vi) he derived Azco's projected growth rate (used to calculate lost

9    profits beyond five years) by comparing unprofitable Azco to established companies,

10   each with more than a billion dollars in annual revenue.

11   *1.   Flaw 1: Mr. Buss accepted Mr. Adams's assumptions without*

12   *performing an independent analysis.*

13          As Mr. Buss testified repeatedly during his deposition, J Adams was at least

14   one of the sources for the following key assumptions in Mr. Buss's report: that the

15   parties agreed to the March 2011 Term Sheet; that the Distributor Agreement was *not*

16   part of the IBS-Azco relationship; that Azco was working to resolve the issues for the

17   one MAX-Seq sold, the successful resolution of which would lead to additional sales

18   to that customer; that Azco would sell eight MAX-Seq from July 1, 2012 to June 30,

19   2013; that Azco's sales would grow as projected over five years; that Azco would be

20   an exclusive distributor; and that the parties would work together into perpetuity.[38/]

21   When an expert relies on information provided by a party or by counsel, the expert

22   must independently verify that information before relying on it.  *King-Indiana Forge,*

23   *Inc. v. Millennium Forge, Inc.*, No. 07-cv-00341, 2009 U.S. Dist. LEXIS 96131, *4

24   (S.D. Ind. Sept. 29, 2009); *see also* FED. R. EVID. 703.  This prevents experts from

25   becoming a mere "mouthpiece" for the plaintiff.  *Id.*

26   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27   [38/] *Id.*, at 59:9-14; 102:7-24; 114:4-17; 141:2—142:17; 169:15—170:25; 189:5—
     190:12.  In some of these instances, Mr. Buss relied on both conversations with J
28   Adams and documents provided by counsel.

1    Here, Mr. Buss failed to discern what information from Mr. Adams is relevant

2    or reliable. For instance, Mr. Buss projected sales into perpetuity as part of his

3    damages analysis, because Mr. Adams instructed him to do so.[39/] Mr. Buss admitted

4    that he did not know whether extending sales into perpetuity was a common method

5    of evaluating damages in the NGS market.[40/] Mr. Buss's lack of qualifications

6    prevented him from knowing which information and which data were reliable.[41/]

7            *2.   Flaw 2: Mr. Buss unreasonably relies on Plaintiffs' forecasts to*

8                  *project sales of the MAX-Seq.*

9    Mr. Buss relied on Plaintiffs' projections in the Term Sheet and other

10   documents to project sales of the MAX-Seq.[42/]  But to the extent Mr. Buss could rely

11   on the Term Sheet and Plaintiffs' other forecasts, he ignores the fact that Azco badly

12   estimated its projected sales.  In the Term Sheet, J Adams projected that Azco would

13   sell eight to twelve MAX-Seq instruments in ***2011***.[43/] In fact, Azco did not sell any

14   IBS instruments in 2011 and sold only one in 2012.

15   Mr. Buss's incorporation of Azco's forecast into his damages model was

16   unreliable. *See Parlour*, 152 Cal. App. 4th at 289-90.  In *Parlour*, the expert based his

17   assumptions on numbers compiled by two officers of the plaintiff, both of whom had

18   significant experience in the industry (and one of whom had an MBA). *Id.* The

19   officers' projections were for a potential investor and set forth a five-year forecast. *Id.*

20

----

21   [39/] *Id.*, at 189:2—190:12.
     [40/] *Id.*

22   [41/] In an email to Dr. Gordon, Mr. Adams admitted that he is "not very good with the
     day-to-day details that are required to run a company such organization, accounting,

23   finance, and operations." Grammel Decl., Exhibit I.
     [42/] Grammel Decl., Exhibit A, at Schedule 8; Grammel Decl., Exhibit B, at 159:2—

24   165:5.  The Term Sheet only forecasts sales for 2011 and 2012, so Mr. Buss must
     have used targets from other documents, which appear to be listed on page 14 of his

25   Report.  These other documents seem to provide the projections for years 4 and 5; the
     target of 35 units for year 3 is missing from any of the documents and appears to be

26   Mr. Buss's own creation, despite his inexperience in the NGS market.  *See id.*, at
     161:12-20.  In any event, the reliance on any of Plaintiffs' projections in any of these

27   documents fails for the same reasons.  *See Parlour*, 152 Cal. App. 4th at 289-90.
     [43/] Grammel Decl., Exhibit J, at IBS_0000552—IBS_0000553.

28

Even though the defendant admitted that he discussed these forecasts with the plaintiff's officers, the court still rejected their use because there was no testimony about "how the projections were actually calculated or upon what facts they were based." *Id.* at 290. Projections must be based on *facts*, not unsubstantiated forecasts without independent expert analysis. *Id.*; *see McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (excluding damages experts who based their opinions on "unsupported assumptions and unsound extrapolation"); *Hilderman*, 2010 U.S. Dist. LEXIS 11391 (excluding expert opinion on lost profits as too speculative).

Furthermore, courts have routinely rejected expert opinions where, like here, the expert merely relies on estimates without examining their basis or underlying assumptions.  The "wholesale adoption of Plaintiff's estimates, without revealing or apparently even evaluating the bases for these estimates, goes beyond relying on facts or data and instead cloaks unexamined assumptions of expert analysis." *Ask Chemicals, LP v. Computer Packages, Inc.*, 593 Fed. App'x 506, 510 (6th Cir. 2014); *King-Indiana Forge*, 2009 U.S. Dist. LEXIS 96131, at *4.  Where an expert merely offers his client's opinion as his own, that opinion may be excluded. *See CIT Business Group v. Graco Fishing and Rental Tools, Inc.*, 815 F. Supp. 2d 673, 677 (S.D.N.Y. 2011) (granting motion *in limine* to exclude expert testimony on lost profits on these grounds).

Similarly, Mr. Buss did not independently verify Mr. Adam's projections. Like the expert excluded in *Ask Chemicals*, Mr. Buss did not verify Mr. Adams's numbers or do an independent analysis of the NGS market.  Indeed, for the reasons stated above, Mr. Buss lacks the expertise to have done so.  Instead, Mr. Buss ignores the actual sales data and instead adopted earlier, outdated projections that already proved to be way off the mark by July 2012.  To make matters worse, Mr. Buss simply shifts the outdated projection forward and assumes that Azco would have sold

eight machines from **July 1, 2012 to June 30, 2013**.[44/] Because Azco did not sell those machines in 2011, Mr. Buss just assumed they would be sold later.[45/] Not only is this shift unexplained, it ignores the fact that J Adams later revised his 2011 projections downward to *three* MAX-Seqs.[46/] Furthermore, Mr. Buss's analysis ignores Azco's own opinion that the window for the MAX-Seq was closing quickly as of March 2011, so delaying sales for over a year would not have been practical.[47/] Mr. Buss errs by relying on outdated projections and then compounds that error by unreasonably manipulating those forecasts. This is precisely the kind of situation where the expert is merely a "mouthpiece" for Plaintiffs and Plaintiffs' counsel, with a lack of hard data and without any independent analysis. The result is a speculative projection of lost profits.

> 3. *Flaw 3: Mr. Buss relies on IBS's sales forecasts for the MINI-20 from one of IBS's grant applications, but ignores all of the caveats and assumptions utilized in that forecast.*

Mr. Buss relied on an NIH grant application submitted by IBS in December 2011 to forecast sales of the MINI-20, but he adopted the MINI-20 forecasts out of context and ignored all of the key assumptions that IBS listed in its application, without explaining this "selective use of facts." *See Nelson*, 2012 U.S. Dist. LEXIS 118300, at *28. Mr. Buss reproduced a chart from this December 2011 application, which provides IBS's revenue forecast for sales of the MINI-20, among other things. But Mr. Buss did not consider that IBS heavily qualified its revenue projections, even though these qualifications appear on the same page as the chart Mr. Buss used.

---

[44/] Grammel Decl., Exhibit B, at 93:7—96:11.
[45/] *Id.*, at 141:2—142:17.
[46/] *See* Grammel Decl., Exhibit K, at IBS_0006107.
[47/] Grammel Decl., Exhibit B, at 176:3—178:16 (discussing Azco's revised sales projection); *id.*, at 180:3—182:4 (discussing Azco's statement about being "too eager" to sell MAX-Seqs in early 2011 to avoid moving "too slowly" and missing the "remaining market opportunity for second-generation sequencing").

On that page, IBS stated: "Although some of the markets we potentially address with our technology are huge, they are very much emerging rather than established…Even with surveys and expert opinion (we have some such data to date), this **will be hard to predict**."[48/]  In describing the forecast, IBS notes that they have "assumed that an *early version* of a higher throughput sequencing product [i.e., the MAX-Seq] is launched in late-2012 and some *early access sales* of the low-cost system [the MINI-20] in 2013."[49/]  IBS then lists *sixteen* assumptions that were used to develop the projections, including the receipt of a certain amount in grant revenue and an increase in employee headcount from 14 to 62 over four years.[50/]  IBS continued that it would need "additional outside financing" to raise the $10 million necessary to "get into production, marketing, and sales."  All of these assumptions were incorporated as part of IBS's forecasts.  Mr. Buss does not mention any of these assumptions in his report, or whether the *sixteen assumptions* underlying IBS's forecast were actually met.  Instead, Mr. Buss cherry-picked a forecast from a lengthy grant application.  The "selective use" of these numbers, outside of their proper context, shows that Mr. Buss's methodology is not reliable.

### 4. Flaw 4: Mr. Buss assumes that Azco would be selling future generations of IBS products into perpetuity.

Mr. Buss's damages model also assumes that Azco would sell IBS products into perpetuity. For the reasons discussed in IBS's other motions *in limine*, there is no evidence that the parties ever discussed a perpetual term, and Azco should be precluded from introducing evidence regarding its unexpressed intent that the term of the alleged oral agreement was perpetual in nature.  As a result, Mr. Buss's testimony, which is based on a perpetual term, should be excluded.

---

[48/] Grammel Decl., Exhibit A, at Schedule 8; Grammel Decl., Exhibit L (emphasis added).
[49/] *Id.*
[50/] *Id.*  IBS did not receive the grant for which it submitted this application.  *See* Grammel Decl., Exhibit M, Deposition Transcript of Steven Gordon, at 80:12-19.

1    Moreover, even Azco's projections, which proved to be wildly off the mark by

2  the time Mr. Buss wrote his report, are only for five years.[51/] J Adams testified that

3  five-year projections are **standard in the industry**.[52/] Yet Mr. Buss adopted Azco's

4  outdated and incorrect projections, pushed them forward 18 months despite the

5  closing window of opportunity, and then explicably projected sales (and thus lost

6  profit damages) into perpetuity.

7    Mr. Buss's model of damages into perpetuity also goes well beyond Plaintiffs'

8  allegations because it necessarily assumes the purported oral agreement would cover

9  future products.  Even according to Plaintiffs' own allegations, the parties' alleged

10  oral agreement concerned only two instruments: the MAX-Seq and the MINI-20.

11  When asked if he knew of any NGS product that had been on the market for even ten

12  years, much less into perpetuity, Mr. Buss could not cite a simple example.[53/]  So to

13  stretch the parties' purported oral agreement to products not yet developed or even

14  allegedly agreed upon into perpetuity, Mr. Buss must assume future agreements to

15  cover future unnamed and undeveloped products. There are no allegations, and no

16  evidence, of any agreement to distribute undeveloped products.[54/] The Court should

17  not permit a damages expert to opine on lost profits arising out of future agreements

18  not even alleged by Plaintiffs and based on products that have not even been

19  developed yet.  *See* FED. R. EVID. 401; FED. R. EVID. 403.

20    In addition, testimony about lost profits for future products rests on

21  speculation. Experts may not opine on lost profits for products that have not yet hit

22

----

23  [51/] Grammel Decl., Exhibit B, at 172:22—174:20 ("[E]veryone only did a five-year
24  forecast and I wanted to look at the performance beyond five years, so all I did was
    use a revenue growth rate and didn't worry about projecting the actual number of
25  units.").
    [52/] Grammel Decl., Exhibit H, at 101:15—103:10.
    [53/] Grammel Decl., Exhibit B, at 195:1-11.
26  [54/]   Grammel Decl., Exhibit B, at 173:8—174:20 (discussing that Mr. Buss's
27  projections assume that Azco would sell different versions of IBS's products); *id.* at
    189:1—190:12 (discussing that Mr. Buss projected profits into perpetuity per J
28  Adams).

1   the market. *See Parlour*, 152 Cal. App. 4th at 285, 289 (rejecting expert's lost profit

2   analysis on future ice cream parlors); *Kids' Universe*, 95 Cal. App. 4th at 887

3   (rejecting lost profits based on a website that had never been operated profitably).

4        Here, Mr. Buss opined on damages for instruments yet to be invented or sold,

5   and then extended damages for these future instruments *into perpetuity*.  Mr. Buss's

6   analysis of Azco's alleged lost profits requires argument about future, undeveloped

7   products.  This kind of flawed methodology is unreliable under *Daubert* and Federal

8   Rule of Evidence 702 and is pure speculation.

9        *5.   Flaw 5: Mr. Buss assumed that Azco would be IBS's exclusive*

10              *distributor, despite the undisputed fact that Azco was a non-*

11              *exclusive distributor.*

12       As Mr. Buss acknowledged, the March 2011 Term Sheet characterizes Azco as

13   a non-exclusive distributor, so IBS could have sold its instruments through other

14   distributors or on its own.[55/] Disregarding this key provision, Mr. Buss assumed that

15   Azco would be the ***exclusive*** distributor of ***all*** IBS products (even products that do

16   not exist) into perpetuity.[56/] Because his testimony assumes an exclusive relationship,

17   which is undisputedly incorrect, lost profits damages calculated based on this

18   incorrect assumption are speculative. Moreover, Mr. Buss's opinion should be

19   precluded under Rule 403 because assuming an exclusive relationship would unfairly

20   prejudice IBS, confuse the issues, and mislead the jury.

21       *6.   Flaw 6: Mr. Buss projected Azco's growth by comparing unprofitable*

22              *Azco to well-established companies with billions in revenue.*

23       Mr. Buss has another flaw in his report: he used comparisons to other NGS

24   companies as the foundation for his assumptions about Azco's growth and revenue.

25   Only data about profits earned by "similar businesses operating under similar

26   
27   ———————————
     [55/] *Id.*, at 87:10—88:11; *see* Plaintiffs' Pretrial Memo, at 4.
28   [56/] Grammel Decl., Exhibit B, at 88:19—89:17.

———————————

21

conditions" may be used to estimate lost profits. *Sargon*, 55 Cal. 4th at 774 (2012) (citation omitted); *Parlour*, 152 Cal. App. 4th at 290. In *Parlour*, the court rejected an expert's attempt to compare a new ice cream restaurant company with the much larger, publicly traded restaurant chain, Friendly's. 152 Cal. App. 4th at 290. The expert's "cursory description of Friendly's business model failed to establish its profit-and-loss experience is sufficiently similar to [the plaintiff] to be relevant to the question of plaintiffs' alleged lost profits." *Id.* (citation omitted). Similarly, Mr. Buss compared Azco to three billion-dollar, publicly traded companies; he found Illumina—a company with annual revenues of $1.4 billion—to be the most comparable because of the articles he found online and how the companies described themselves.[57/] Even though Azco was a self-described "used instrument company" with no history of profitability, Mr. Buss projected lost profits based on the expected growth and market activity of three billion-dollar companies. Like *Parlour*, Azco may be trying to enter the same general business as Illumina but their histories of profitability could not be more different. *See Sargon*, 55 Cal. 4th at 776-781 (affirming exclusion of a lost profits expert who compared a new company without a history of profitability to several multi-million, international companies). Thus, Mr. Buss's calculations of Azco's growth using flawed market comparisons result in speculative calculations of lost profits. Moreover, any probative value of Mr. Buss's testimony is substantially outweighed by a danger of unfair prejudice to IBS, confusion of the issues, misleading the jury, and undue delay. FED. R. EVID. 403.

In sum, Mr. Buss's methodology suffers from numerous flaws, any one of which would be fatal on its own. The combination of these errors makes his opinion entirely unreliable and inadmissible.

## CONCLUSION

Mr. Buss's opinion is deeply flawed. He lacks the specialized knowledge

---

[57/] Grammel Decl., Exhibit A, at 4; Grammel Decl., Exhibit B, at 136:3—137:24.

necessary for this case, his testimony is not based on sufficient data, and his methods and conclusions are unreliable. *See* FED. R. EVID. 702.  His opinion would confuse the jury and unfairly prejudice IBS, not to mention waste time and delay adjudication of the simple oral contract issues in this case.  FED. R. EVID. 403. For these reasons, Mr. Buss's opinion should be excluded and Plaintiffs' counsel should not be allowed to argue about his opinions in opening or closing statements, or any other part of the trial.

Dated:  August 31, 2015                    Respectfully submitted,

                                           MINTZ LEVIN COHN FERRIS GLOVSKY
                                           AND POPEO PC


                                           By *s/Justin S. Nahama*
                                                Justin S. Nahama, Esq.

                                           Matthew C. Hurley (*pro hac vice*)
                                           Brian P. Dunphy (*pro hac vice*)
                                           Sean Grammel (*pro hac vice*)
                                           MINTZ LEVIN COHN FERRIS GLOVSKY
                                                AND POPEO PC
                                           One Financial Center
                                           Boston, MA 02111
                                           Telephone: (617) 542-6000
                                           Facsimile:  (617) 542-2241

                                           Email: dtpascucci@mintz.com
                                                    jsnahama@mintz.com
                                                    mhurley@mintz.com
                                                    bdunphy@mintz.com
                                                    smgrammel@mintz.com

                                           *Attorneys for Defendants*

23

**CERTIFICATE OF SERVICE**

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of San Diego, State of California, and am not a party to the above-entitled action.

On August 31, 2015, I filed a copy of the following document(s):

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF IBS'S MOTION *IN LIMINE* TO EXCLUDE PLAINTIFFS' DAMAGES EXPERT, BRIAN BUSS**

by electronically filing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Brian Dunphy | bdunphy@mintz.com |
| Daniel Thomas Pascucci | dpascucci@mintz.com, Docketing@mintz.com, kjenckes@mintz.com |
| Eric J. Eastham | ejeastham@mintz.com, docketing@mintz.com, jsnahama@mintz.com, kasteinbrenner@mintz.com, kjenckes@mintz.com |
| Justin S. Nahama | JSNahama@mintz.com, docketing@mintz.com, KASteinbrenner@mintz.com |
| Maria C Severson | mseverson@amslawyers.com, mbyrnes@amslawyers.com |
| Mark C. Mazzarella | mmazzarella@mazzlorenz.com, daral@mazzarellalaw.com, lsanders@mazzlawgroup.com, pam@mazzarellalaw.com |
| Matthew C. Hurley | MCHurley@mintz.com |
| Michael J Aguirre | maguirre@amslawyers.com, mbyrnes@amslawyers.com |
| Sean Grammel | smgrammel@mintz.com |

Executed on August 31, 2015, at San Diego, California.  I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

*s/Justin Nahama*
Justin Nahama